COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WILLIE C. BASSETT, JR.,

        Defendant-Appellant.

UNPUBLISHED
November 20, 2014

No. 315568
Wayne Circuit Court
LC No. 11-011915-FC

Before: HOEKSTRA, P.J., and WILDER and FORT HOOD, JJ.

PER CURIAM.

Defendant appeals as of right his conviction by jury of first-degree felony murder, MCL 750.316(1)(b), first-degree child abuse, MCL 750.136b(2), and second-degree child abuse, MCL 750.136b(3). The trial court sentenced defendant to concurrent terms of life imprisonment without parole for the murder conviction, 10 to 15 years in prison for the first-degree child abuse conviction, and two to four years in prison for the second-degree child abuse conviction. We affirm.

Defendant's convictions arise from the death of his three-month-old infant daughter, BB. According to the testimony of medical experts, BB died from non-accidental head trauma. During the day preceding BB's admission to the hospital and her subsequent death, the child was in defendant's sole care.

I

Defendant first incorrectly submits that this Court must reverse his convictions because the trial court questioned six prosecution witnesses at length in a manner that allegedly signaled the trial court's bias against defendant. Defendant concedes that he did not preserve this issue by objecting to the trial court's questioning of the witnesses. Therefore, we review this issue only to ascertain whether any plain error affected his substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999); *People v Davis*, 216 Mich App 47, 51; 549 NW2d 1 (1996).

MRE 614(b) provides that a "court may interrogate witnesses, whether called by itself or by a party." This rule recognizes that "[t]he trial court may question witnesses in order to clarify testimony or elicit relevant information." *People v Conyers*, 194 Mich App 395, 404; 487 NW2d 787 (1992). But the "trial court should conduct a trial with a view to eliciting the truth and to

attaining justice between the parties." *Davis*, 216 Mich App at 49 (internal quotation and citation omitted). A trial judge possesses

> good reason to interject itself into the trial . . . when a witness is difficult or is not credible and the attorney fails to adequately probe the witness, . . . if a witness becomes confused," or the "attorneys for both sides avoid asking a witness a material question . . . In these and other appropriate instances, the trial court may have good reason to question a witness in order to enhance the role of the criminal trial as a search for substantive truth. [*Id*. at 49-50.]

A trial judge does not deprive a defendant of a fair trial by asking "questions posed in a neutral manner." *Id*. at 50.

"The principal limitation on a court's discretion over matters of trial conduct is that its actions not pierce the veil of judicial impartiality." *Davis*, 216 Mich App at 50. In *Conyers*, 194 Mich App at 405, this Court summarized the following relevant cautionary principles governing judicial questioning of witnesses:

> [T]he trial court must exercise caution and restraint to ensure that its questions are not intimidating, argumentative, prejudicial, unfair, or partial. The test is whether the judge's questions and comments may well have unjustifiably aroused suspicion in the mind of the jury as to a witness' credibility, and whether partiality quite possibly could have influenced the jury to the detriment of defendant's case. [Internal quotations, citations and emphasis omitted.]

"A trial court may not assume the prosecutor's role with advantages unavailable to the prosecution," but "the fact that testimony elicited by a court's questions damaged a defendant's case did not demonstrate that the court had improperly assumed the role of surrogate prosecutor." *Davis*, 216 Mich App at 51 (internal quotation and citation omitted).

The record reveals that the questions asked of Ashley Thomas, BB's mother, by the prosecutor and defense counsel left unclear many details concerning the child's home life at the time she endured her injuries, which defendant denied having inflicted. Thomas was the sole trial witness to testify regarding BB's home life around the time of her death. The trial court elicited from Thomas additional, relevant details about BB's home life during the months before her death. See *People v Daoust*, 228 Mich App 1, 13; 577 NW2d 179 (2001) (finding properly admitted evidence regarding a prior incident of child abuse because "it helped to put the charged activity in context," especially given that the defendant "denied ever participating in [the child's] discipline"), overruled in part on other grounds in *People v Miller*, 482 Mich 540, 561; 759 NW2d 850 (2008). The trial court's more limited questioning of several other witnesses also elicited relevant details.

Defendant does not specifically identify any purportedly irrelevant or unfairly prejudicial topic of questioning by the trial court, but argues that, by extensively questioning the witnesses, the judge injected himself as a second prosecutor. Even if the excessive nature of the trial court's questions crossed the line of judicial impartiality, defendant cannot establish plain error affecting his substantial rights. *Davis*, 216 Mich App at 51. Absent the trial court's questions,

the record demonstrates ample properly admitted evidence of defendant's guilt, including the medical testimony describing the nature of BB's injuries, and Thomas's testimony regarding defendant's physical abuse of her and his sole care for BB while Thomas was working on the days before the child began exhibiting symptoms of brain death. The trial court also instructed the jury that "[m]y comments, rulings, questions and instructions are also not evidence," and jurors presumptively follow their instructions. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008); *Davis*, 216 Mich App at 52. In light of the evidence admitted at trial and the curative effect of the trial court's instructions, any error in the trial court's questioning of witnesses does not require reversal. Moreover, defendant cannot overcome the strong presumption that defense counsel's performance constituted trial strategy and establish he was denied the effective assistance of counsel because counsel failed to object to the trial court's lines of questioning, as a whole, on the basis of judicial impartiality—there are times when it is better not to object and draw attention to impropriety. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001); *People v Bahoda*, 448 Mich 261, 287 n 54; 531 NW2d 659 (1995).

II

Defendant next argues that the trial court deprived him of a fair trial by allowing evidence of domestic violence that he inflicted on Thomas during the months before BB's death. Defendant contends that the evidence was not relevant to the issue whether he ever harmed BB, and was unfairly prejudicial because no other evidence of record suggested that he had a motive to harm BB or cause her harm.

We review for an abuse of discretion a trial court's decision whether to admit evidence, but consider de novo any preliminary questions of law involved in the decision. *People v Railer*, 288 Mich App 213, 219; 792 NW2d 776 (2010); *People v Matuszak*, 263 Mich App 42, 47; 687 NW2d 342 (2004). A trial court's ruling "on a close evidentiary question ordinarily cannot be an abuse of discretion." *People v Cameron*, 291 Mich App 599, 608; 806 NW2d 371 (2011) (internal quotation and citation omitted). An abuse of discretion exists if "the court chooses an outcome that falls outside the range of principled outcomes." *People v Douglas*, 496 Mich 557, 565; 852 NW2d 587 (2014); slip op at 6 (internal quotation and citation omitted).

Pursuant to MCL 768.27b, the trial court properly admitted evidence that defendant directed physical violence toward Thomas during the months before BB's death. In relevant part, MCL 768.27b provides:

> (1) . . . [I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.
>
> * * *
>
> (5) As used in this section:
>
> (a) "Domestic violence" or "offense involving domestic violence" means an occurrence of 1 or more of the following acts by a person that is not an act of self-defense:

-3-

(*i*)      Causing or attempting to cause physical or mental harm to a family or household member.

* * *

(b)      "Family or household member" means any of the following:

* * *

(*ii*)      An individual with whom the person resides or has resided.

(*iii*)      An individual with whom the person has or has had a child in common. . . .

Because the present charges against defendant involved domestic violence against his daughter, his past acts of domestic violence against Thomas qualified as admissible for any relevant purpose, subject to exclusion under MRE 403. MCL 768.27b(1); see also *Cameron*, 291 Mich App at 609-610. The evidence of defendant's assaults of Thomas was relevant to his propensity to have physically assaulted BB. *People v Watkins*, 491 Mich 450, 487; 818 NW2d 296 (2012) (holding that "when applying MRE 403 to evidence admissible under MCL 768.27a," a statue similar to MCL 768.27b, "courts must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect"). The evidence also possessed probative value toward (1) bolstering the credibility of Thomas's denial that she ever assaulted BB, (2) substantiating that BB did not suffer her injuries accidentally, and (3) proving the circumstances of Thomas's and defendant's relationship around the time of BB's fatal injury. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011); *Cameron*, 291 Mich App at 612.

"[W]hen applying MRE 403 to evidence admissible under MCL 768.27a [and MCL 768.27b]," courts should take into account

> several considerations that may lead a court to exclude such evidence. These considerations include (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. [*Watkins*, 491 Mich at 487.]

These considerations pertain to "whether the probative value of the evidence admissible under MCL 768.27a [and MCL 768.27b] . . . is nonetheless outweighed by the danger of unfair prejudice." *Id*. at 489; see also *People v Duenaz*, 306 Mich App 85, 99; 854 NW2d 531 (2014).

Thomas recounted that defendant slapped her face, pulled her hair, pushed her, and once pushed her out of a chair onto the floor. The manner in which BB was injured involved vigorous shaking. Although the method of injury and age of the victims may not have been identical, defendant placed his hands on two female members of his household. Defendant's acts of violence toward Thomas occurred in the days, weeks, and months before BB suffered her fatal injuries, and the acts thus occurred in close temporal proximity. Thomas's testimony established

-4-

that defendant's physically assaultive conduct toward her happened frequently before BB's death. Nothing in the record undercut the reliability of Thomas's testimony to having endured defendant's physical abuse.

Because few of the unfair prejudice factors delineated in *Watkins* weigh against the admissibility of the evidence of defendant's domestic violence against Thomas, we conclude that the trial court acted within its discretion to the extent that it found that no unfair prejudice substantially outweighed the probative value inherent in the evidence of defendant's prior assaults of Thomas. MRE 403. We also detect no potential that the evidence of defendant's prior domestic violence against Thomas adversely affected him "by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock," or that any danger exists "that marginally probative evidence will be given undue or preemptive weight by the jury." *Cameron*, 291 Mich App at 611 (internal quotations and citations omitted).

III

Defendant further asserts that the trial court erred in admitting character evidence consisting of his anger management issues, liquor consumption, and unemployment. Defendant posits that the court also erred in admitting testimony about BB's healing rib fractures and evidence of Thomas's good character, specifically her long-term employment, arguing this evidence was irrelevant. Defendant also argues that the prosecutor committed misconduct by highlighting this evidence during her opening statement and closing argument.

Defendant preserved the argument about past alcohol use, but did not preserve his objections to the other character evidence. MRE 103(a)(1); *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). We review for an abuse of discretion the trial court's admission of the evidence regarding defendant's alcohol consumption. *Railer*, 288 Mich App at 219. We review the remaining unpreserved contentions of error only to ascertain whether any plain error affected defendant's substantial rights. *Carines*, 460 Mich at 763-764.

The evidence of Thomas's employment, defendant's alcohol use, defendant's alcohol-fueled anger toward Thomas, and defendant's unemployment were all relevant to the circumstances of BB's care at the time of her death and the relationship between defendant and Thomas. See *Daoust*, 228 Mich App at 13-14. Because defendant cared for BB while Thomas worked, including the time period when BB suffered her fatal injuries, and defendant denied harming BB, the challenged evidence possessed significant probative value toward illuminating the circumstances of BB's care and her parents' relationship. MRE 401. Contrary to defendant's complaint, this evidence did not constitute improper propensity evidence. We discern no unfair prejudice that substantially outweighed the probative value of the evidence. MRE 403. We detect no potential that the evidence "inject[ed] considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, danger or shock," *Cameron*, 291 Mich App at 611, that the jury was likely to assign the evidence "undue or preemptive weight," or that it otherwise was "inequitable to allow use of the evidence," *Meissner*, 294 Mich App at 451 (internal quotation and citation omitted).

We also conclude that the trial court properly admitted the medical evidence documenting that BB had rib fractures of different ages. This evidence had significant probative

value toward establishing that the child did not accidentally suffer her fatal injuries. MRE 401; *Cameron*, 291 Mich App at 612. We again discern no likelihood of any unfair prejudice that would substantially outweigh the probative value of the evidence. MRE 403.

Because the challenged evidence qualified as relevant and admissible pursuant to MRE 401, MRE 402, and MRE 403, defendant's related suggestion that the prosecutor engaged in misconduct lacks merit. *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999).

IV

Defendant additionally submits that the trial court deprived him of a fair trial by sua sponte reading the jury an aiding and abetting instruction that had no support in the evidence. We generally consider de novo claims of instructional error. *People v Bartlett*, 231 Mich App 139, 143; 585 NW2d 341 (1998). We review "for an abuse of discretion a trial court's determination that a specific instruction" applies or does not apply to the facts of record. *People v Hartuniewicz*, 294 Mich App 237, 242; 816 NW2d 442 (2011); see also *People v Young*, 472 Mich 130, 135, 141; 693 NW2d 801 (2005).

"A criminal defendant has the right to have a properly instructed jury consider the evidence against him." *People v Rodriguez*, 463 Mich 466, 472; 620 NW2d 13 (2000). We review jury instructions as a whole to determine whether error requiring reversal occurred. *Bartlett*, 231 Mich App at 143. The jury instructions must include all elements of the charged offenses, and must not omit material issues, defenses, and theories that the evidence supports. *Id*. Even when somewhat imperfect, jury instructions do not qualify as erroneous provided that they fairly present to the jury the issues to be tried and sufficiently protect the defendant's rights. *People v Knapp*, 244 Mich App 361, 376; 624 NW2d 227 (2001); *Bartlett*, 231 Mich App at 143.

To support a conviction pursuant to an aiding and abetting theory of guilt under MCL 767.39, the prosecutor had to show that (1) defendant or some other person committed the crime charged, (2) defendant performed acts or offered encouragement that assisted the crime's commission, and (3) either (a) at the time that defendant gave aid and encouragement, he possessed (i) the requisite intent necessary to support his conviction of the charged crime as a principal, or (ii) knowledge that the principal intended the commission of the charged crime, or (b) "the criminal act committed by the principal is an incidental consequence which might reasonably be expected to result from the intended wrong." *People v Robinson*, 475 Mich 1, 6, 9; 715 NW2d 44 (2006) (internal quotations and citation omitted); see also *People v Mass*, 464 Mich 615, 628; 628 NW2d 540 (2001). "The phrase 'aids or abets'" encompasses "any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004).

Defendant objected to the trial court's proposal to provide an aiding and abetting jury instruction because the prosecutor had not pursued this theory at trial. In response, the prosecutor cited defendant's statement to the police in which he stated he knew BB was injured, but "did nothing to assist." The prosecutor also argued an expert's testimony that BB might have sustained her injury days before her death "would indicate an aiding and abetting theory since [defendant] was with BB for a period of time during the period of days." Defendant had argued

to the jury that he did not have exclusive access to BB during that time. The trial court found that aiding and abetting was an appropriate instruction, citing evidence of defendant's knowledge that someone had injured his child.

MCL 769.26 provides:

> *No judgment or verdict shall be set aside or reversed* or a new trial be granted by any court of this state in any criminal case, *on the ground of misdirection of the jury*, . . . *unless* in the opinion of the court, after an examination of the entire cause, *it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice*. [Emphasis added.]

A reviewing court should gauge an error's effect "by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *Lukity*, 460 Mich at 495.

Even if we were to conclude that there was no evidence supporting the aiding and abetting instruction, we conclude that defendant has not substantiated that the trial court's provision of that instruction occasioned a miscarriage of justice in this case. Ample properly admitted evidence established defendant's guilt and it is not more probable than not that the aiding and abetting instruction either contributed to or was the basis for the jury's finding of guilt. Under the circumstances, we cannot conceive of a manner in which the improper aiding and abetting jury instruction more probably than not "resulted in a miscarriage of justice." MCL 769.26.

V

Defendant lastly seeks a new trial on the basis that the great weight of the credible evidence introduced at trial went against the jury's verdict. Defendant challenges the soundness of testimony by Dr. Ajit Sarniak, who opined that BB's brain death happened within approximately six hours of her brain injury. Defendant points to the testimony of two experts in forensic pathology denying that the condition of BB's body allowed for a determination of when she might have suffered her fatal injury. Defendant also highlights Dr. Ljubisa Dragovic's estimation that BB might have endured her head injuries days before her brain death. According to defendant, because the evidence did not precisely establish the timing of BB's head injuries, the credible evidence allowed that someone other than defendant could have inflicted BB's fatal injuries. Because defendant did not raise the purported evidentiary deficiency in the trial court, we review it only to ascertain whether any plain error affected defendant's substantial rights. *Carines*, 460 Mich at 763-764.

A new trial premised on "the weight of the evidence should be granted only where the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." *People v Lemmon*, 456 Mich 625, 642; 576 NW2d 129 (1998) (internal quotation and citation omitted). "[A]bsent exceptional circumstances, issues of witness credibility are for the jury, and the trial court may not substitute its view of the credibility 'for the constitutionally guaranteed jury determination thereof.'" *Id.* at 642, quoting *Sloan v Kramer-Orloff Co*, 371 Mich 403, 411; 124 NW2d 255 (1963). "Unless it can be said that directly

contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *Lemmon*, 456 Mich at 645-646 (internal quotation and citation omitted).

Dr. Sarniak testified "as an expert in . . . pediatric medicine and pediatric critical care." He recalled encountering BB on the morning of August 4, 2011, by which time she was on a ventilator. Dr. Sarniak averred that he had reviewed the medical records and the documentation of tests performed on BB earlier that morning, including a CAT scan of her head showing bilateral skull fractures, "a subdural hematoma, and . . . evidence of . . . ischemia which is poor or disordered blood flow in the brain that was quite diffuse," a skeletal survey showing that BB also had "[h]ealing left posterior 6th through 9th rib fractures and acute [or new, within the last couple days] appearing right anterior 6th through 8th rib fractures," and reports documenting hemorrhages in BB's eyes. He also assessed her pupils for reactivity.

In light of "[t]he constellation of clinical findings, including retinal hemorrhages, [acute rib fractures,] . . . skull fractures and subdural hemorrhage" that BB suffered on the same day, Dr. Sarniak opined with medical certainty that they resulted from nonaccidental trauma. Dr. Sarniak testified that given the nature of BB's injuries, "to a reasonable degree of medical certainty" he would have expected to detect symptoms in BB between one and three or four hours after she suffered the injuries. Although Dr. Sarniak could not identify a precise time when BB's injuries occurred, he opined that in light of the rapid progression in her symptoms from difficulty breathing to "very clearly manifested . . . severe brain injury," the injuries had been inflicted "in the six hours or so before she actually went on the ventilator" at Henry Ford Hospital early on the evening of August 3, 2011.[1]

Dr. Francisco Diaz, the assistant Wayne County medical examiner, classified BB's death as a homicide caused by closed head trauma. Dr. Diaz denied that he could identify with medical certainty how long after BB's injuries she would have appeared to have difficulty breathing. However, Dr. Diaz repeatedly characterized his examination as hampered because the autopsy had occurred three days after BB was declared brain dead and an intervening surgery removed most of her internal organs for donation. He confirmed that he had taken no tissue samples and undertaken no scientific testing designed to identify the age of BB's injuries. In Dr. Diaz's opinion, this exercise would have proven futile given the approximately 96 hours that intervened between BB's first hospital visit and the autopsy, during which BB received substantial intensive care treatments at two hospitals and underwent the organ removal surgery.

Dr. Dragovic, who testified as a defense expert in anatomical pathology, forensic pathology, and neuropathology, reviewed Dr. Diaz's autopsy report and photographs, as well as other unspecified documents, and concluded that BB had died from "blunt force trauma [to her

---

[1] Dr. Sarniak explained that he had worked on approximately 20 other cases in which he knew "when the injury occurred and the death occurred." Dr. Sarniak added that a remote possibility existed that the child's injuries might have occurred up to 12 hours before her placement on life support.

head] and complications thereof that occurred over a period" in excess of 36 to 48 hours. According to Dr. Dragovic, to reach an accurate estimate of the time of BB's injury, he would have required much more information than the present record contained, including "samples of the hard coverings of the brain with the blood that was adherent to the inner surface" for review under a microscope and treatment with stains to measure iron levels in BB's blood. But when asked whether he received documentation from Children's Hospital of BB's three distinct skull fractures, Dr. Dragovic replied, "I only saw one fracture documented at autopsy. . . . I'm not going to take any . . . statement . . . from clinical medicine unless it can be substantiated at the time of the autopsy." He also denied recalling the precise interval of time that BB spent hospitalized before her autopsy, or that he had reviewed any ophthalmology reports or CAT scans from Children's Hospital, or Dr. Sarniak's reports.

Defendant points to the testimony of Drs. Diaz and Dragovic as contradicting Dr. Sarniak's estimation that BB likely experienced her injuries approximately six hours before going to the hospital early on the evening of August 3, 2011. However, Dr. Diaz did not contradict Dr. Sarniak's timing testimony. Dr. Diaz acknowledged that the lengthy delay before the occurrence of BB's autopsy prevented him from determining an accurate estimation of when she suffered her fatal injuries. Although Dr. Dragovic placed BB's fatal injuries several days before August 3, 2011, his testimony rested on Dr. Diaz's incomplete autopsy and failed to take into account most of the clinical findings by Children's Hospital. Alternatively phrased, Dr. Dragovic's opinion had its own potential credibility issues. We reject that defendant has shown that Dr. Sarniak's opinion testimony qualified as "so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities." *Lemmon*, 456 Mich at 645-646 (citation and quotation marks omitted). We conclude that defendant has failed to substantiate exceptional circumstances that would warrant this Court's revisitation of the jury's weighing of Dr. Sarniak's credibility. *Id.* at 642.

Affirmed.

/s/ Joel P. Hoekstra
/s/ Kurtis Wilder
/s/ Karen M. Fort Hood